IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA, )
)
        Plaintiff, )
)
v. ) Case No. 09-20133-JWL
)
GLADSTONE MCDOWELL, et al., )
)
        Defendants. )
)
_____)

## MEMORANDUM AND ORDER

The matter is presently before the Court on motions to suppress filed by defendants Sheldon McIntosh (Doc. # 333), Curtis Pitter (who refers to himself as Michael Francois) (Doc. # 338), Ibrahima Kane (Doc. # 341), Dwight Rhone (Doc. # 357), and Theodore McDowell (Doc. # 479), relating to searches of a house and vehicle in Arizona on May 2, 2007. Defendant Samora McIntosh has also joined in these motions (see Doc. # 363). The Court conducted hearings on these motions on November 16, 2010, and January 3, 2011. The Court has considered the briefs submitted by the parties and the evidence and argument presented at the hearings, and it **denies** the motions to suppress.

### I.    **Evidence Presented**

Avondale, Arizona Police Officer Reggie Sayles testified as follows: Avondale

police received a request from a neighboring city's police department to help locate a woman wanted in connection with an assault. At approximately midnight on the morning of May 2, 2007, Officer Sayles was told that the woman might be at a residence in Avondale, and he proceeded to that address. When he did not spot the woman's vehicle, he intended to inquire about the woman at the front door, and he proceeded down the sidewalk and up the driveway of the house. When he came within ten feet of the garage, he detected the odor of fresh, unburned marijuana. He could still smell the marijuana at the front door, but the odor was strongest at the closed garage door. He had no doubt that he smelled marijuana. Instead of inquiring at the front door, Officer Sayles called for additional officers, for safety purposes and for additional witnesses to the marijuana odor. Eventually a canine officer was requested, and the dog alerted to the presence of marijuana at the garage. Officer Sayles then returned to his car to take up a surveillance position away from the house.

At approximately 4:00 a.m. that same day, Officer Sayles was told by other officers that a van had been seen leaving the residence. Officer Sayles saw the van proceeding without headlights, with only the parking lights on, in violation of Arizona law. He also noted that the van's license plate was hanging from its place with only one screw, also in violation of Arizona law. (A photograph of the license plate introduced into evidence shows one side hanging approximately one inch lower than if it had been affixed with two screws.) Officer Sayles then stopped the van approximately one-half mile from the residence, and he was joined by Officer Freeman Carney. When Officer

2

Carney approached the driver of the van, he smelled fresh, unburned marijuana. The officers then detained the driver, defendant Curtis Pitter, and searched the vehicle. The officers found paraphernalia commonly used for packing marijuana, including bags, axle grease, cedar chips, packing peanuts, and saran wrap that contained marijuana leaves.

Officer Carney testified that he heard that Officer Sayles was conducting a traffic stop, and he decided to provide backup for the stop. He approached the driver, Mr. Pitter, and detected the strong odor of marijuana. The officers then detained Mr. Pitter, conducted the search, and subsequently arrested Mr. Pitter.

Officer Thomas Baker testified that he arrived at the Avondale residence after Officer Sayles requested additional officers, and that he detected the very strong, overpowering odor of fresh, unburned marijuana. As with a typical situation involving a possible drug stash house, a police supervisor was called. In addition, a canine unit was called to the residence, and the dog's handler, Officer Melrose, indicated that the dog had alerted to the presence of marijuana at the garage door. Officers then decided to obtain a search warrant for the residence.

Avondale Police Sergeant Jonathon Martin testified as follows: Sergeant Martin arrived at the house at approximately 2:00 a.m., where he met Officer Sayles, Officer Baker, and Sergeant Armstrong. Sergeant Armstrong stated that he and the other officers had detected the odor of marijuana. Sergeant Martin also detected the odor of fresh marijuana emanating from a vent above the garage door. Sergeant Martin testified that he had previously worked with the canine handler, Officer Melrose, and that Officer

3

Melrose had been trained in canine searches. After approximately 30 minutes at the house, Sergeant Martin returned to his office to begin his affidavit for an application for a search warrant. Sergeant Martin also included information concerning the traffic stop of the van in his affidavit. When he completed the application, he faxed it to Superior Court Commissioner Michael Barth and then spoke with the Commissioner by telephone. Commissioner Barth made certain interlineations in the affidavit and warrant for Sergeant Martin, and the Commissioner signed and faxed back the affidavit and warrant, which also included a file stamp from Commissioner Barth's office. Sergeant Martin received the signed warrant at approximately 7:00 a.m., and the warrant was then executed at the residence. After the search, Sergeant Martin completed and filed a return on the warrant.

Defendants' only witness in support of their motions to suppress was Donald Lock, a handwriting expert. Mr. Lock testified that the Commissioner's signature on the warrant application contained characteristics of non-genuineness. For instance, the signature indicated four or five pen lifts, which could be associated with an attempt to emulate a signature. Mr. Lock also noted that the signature on the application differed materially from the Commissioner's signature on the actual search warrant. Moreover, Mr. Lock noted that the initial letter "M" in the Commissioner's signature on the application was similar to an "M" in the signature of Sergeant Martin on the application. Mr. Lock testified, however, that he could not say conclusively or to a reasonable certainty that two different people signed the Commissioner's name on the application

4

and on the warrant, or that the same person signed the names of both the Commissioner and Sergeant Martin on the application. Mr. Lock testified that the Commissioner's signature on the warrant contained one or two pen lifts, but "looked pretty good," in the sense that it did not contain significant characteristics of non-genuineness. Mr. Lock conceded that a typical person may use three or more different signature styles, including a scribbling signature and more formal signatures where the distinct letters may be read. Mr. Lock had one exemplar of Commissioner Barth's signature, contained on a loyalty oath, but that signature was made in a more formal style.

In rebuttal, the Government offered into evidence an affidavit in which Commissioner Barth stated that although he did not recall this particular warrant, he had no reason to believe that he would not have followed his standard practice of signing the application and warrant himself; that the signatures on the application and warrant are indeed his; and that the interlineations on both documents are in his handwriting. The affidavit contains a "scribbling style" signature for Commissioner Barth that is different from the signatures on the application and warrant. Mr. Lock was not asked to offer any opinions about the signature on Commissioner Barth's affidavit.

## II. Search of the Vehicle

Defendant Curtis Pitter challenges the search of the van that he drove from the Avondale residence. "[T]he burden is on the defendant to prove that the challenged seizure was illegal under the Fourth Amendment." *United States v. Long*, 176 F.3d

1304, 1307 (10th Cir. 1999). Mr. Pitter has not argued that Officer Sayles had no basis to stop the van, and the Court concludes that the stop was justified. Officer Sayles testified credibly that Mr. Pitter did not activate his headlights while driving at night, that the license plate was not properly affixed, and that Mr. Pitter therefore operated the vehicle in violation of Arizona law. *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.").

The Court rejects Mr. Pitter's argument that the subsequent search of the van was improperly based only on a generalized suspicion of crime, as the totality of the circumstances—the odor of marijuana coming from the van, to which Officer Carney credibly testified, and the fact that the van had just left the garage where a similar odor had been detected—provided probable cause for the search of the van. *See United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998) ("the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle") (quoting *United States v. Morin*, 949 F.2d 297, 300 (10th Cir. 1991)).

Mr. Pitter primarily takes issue with Officer Sayles's testimony that although he believed at the time that he had probable cause to arrest Mr. Pitter prior to the search of the van, he presently believes that he had reasonable suspicion to detain Mr. Pitter and probable cause to search the vehicle. Mr. Pitter appears to argue that the officers effected his arrest before the search without probable cause. The circumstances that

6

justified the search, however, also provided probable cause to detain Mr. Pitter. *See United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir. 1999) (odor of marijuana provided reasonable suspicion and probable cause to justify detaining driver). Moreover, Mr. Pitter has not pointed to any authority supporting the position that the presence of probable cause may somehow be undone by the officer's mistaken belief concerning the legal effect of the circumstances presented to him. It is clear that probable cause existed here to justify the search of the van, and therefore the Court denies the motion to suppress evidence obtained from that search.

### III. <u>Search of the House</u>

#### A. *Probable Cause for Warrant*

With respect to the search of the residence, the Court first rejects defendants' argument that the search warrant was not supported by the necessary probable cause. As stated in the affidavit supporting the warrant application, a number of officers and a canine detected the odor of marijuana at the residence, and a van that left the residence contained marijuana wrappings. The Court does not agree that Officer Sayles must not really have detected that odor in light of his request for other officers and the canine unit, or that the observations of the other officers were tainted by the knowledge that Officer Sayles had smelled marijuana. Officer Sayles, Officer Baker, and Sergeant Martin all testified credibly that they did smell marijuana, and they also testified that the canine alerted to the drug's presence. Defendants also questioned at the hearing whether

7

Officer Sayles was truly searching for a particular woman at the residence, but whatever his motivation for being there, the odor of marijuana provided the necessary probable cause for a search.

Defendants have also noted that the warrant application did not contain any details concerning the training, experience, or reliability of the canine and his handler. The application did note that the dog had been certified in the detection of marijuana and other narcotics, however. *See United States v. Kennedy*, 131 F.3d 1371, 1376-77 (10th Cir. 1997) (warrant is sufficient if affidavit states that the dog is trained and certified to detect narcotics). Defendants have not shown that the dog in fact was unqualified. *See United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009) ("A party seeking to suppress evidence bears the burden of proving the dog is unqualified."). Moreover, the fact that multiple officers smelled marijuana provided probable cause even without the dog's confirmation.

Finally, defendants argue that because the officers and the canine did not reaffirm that the smell of marijuana was still present at the residence after the van had left, there was no probable cause to believe that marijuana remained at the residence at the time the warrant was issued. The Court rejects this argument. The fact that a vehicle had left did not necessarily mean that no marijuana remained. In addition, the search of the van yielded only drug paraphernalia, which would have suggested that the drugs remained at the residence. Finally, the application also sought a warrant to search for evidence of the crime, which would include other items that might still have been present at

8

residence even if the marijuana had been removed.

### B. *Entry onto Property*

Defendant Sheldon McIntosh argues in his motion that because no basis has been articulated to link the sought-for woman to this residence, Officer Sayles's stated reason for approaching the residence (to ask for that woman) was pretextual; and that Officer Sayles therefore violated the Fourth Amendment by entering the curtilage of the residence or even by trespassing without proper justification. The Supreme Court has "recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "[C]urtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301. The defendant bears the burden with respect to a claim of an invasion of the curtilage. *See United States v. Cavely*, 318 F.3d 987, 994 (10th Cir. 2003).

The Court finds that defendant has failed to satisfy that burden in this case. First, the Court does not find the pretext urged by Mr. McIntosh, as the Court finds credible Officer Sayles's testimony that he was asked to look for a woman or her vehicle at the

Avondale address; accordingly, the officer had a valid reason for proceeding along the sidewalk and up the driveway toward the front door of the residence. Second, Mr. McIntosh has not shown that the sidewalk or the driveway (from which Officer Sayles detected the odor of marijuana), which were not enclosed and were completely open to the public, should be included in the area reasonably expected to be treated as a part of the home itself. *See, e.g.*, *United States v. Hatfield*, 333 F.3d 1189, 1194-95 (10th Cir. 2003) (open driveway was not part of curtilage; noting that "[w]hen the police come on to private property to conduct an investigation and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment") (citations omitted). Accordingly, the Court rejects this basis for suppression of the evidence obtained in the search of the residence.

### *C. Signatures on the Warrant and Application*

As their final argument for suppression, defendants argue that the Court should find that Commissioner Barth did not sign the affidavit in the application for the search warrant. Defendants further argue, without supporting authority, that the Court should then deem the warrant to be invalid. In support of these arguments, defendants rely on Mr. Lock's testimony that the application signature bears indicia of non-genuineness, as well as the fact that it supposedly took Sergeant Martin so long to complete the application.

The Court rejects this basis for suppression. The Court finds credible Sergeant

Martin's testimony that he talked with Commissioner Barth on the telephone, that Commissioner Barth indicated that he was signing the affidavit and warrant, and that he received both documents back by fax with the Commissioner's signatures. Commissioner Barth has also sworn in an affidavit that he routinely signs the application and warrant himself and that he can identify these signatures (as well as the interlineations) as his. The Court finds that Mr. Lock was also credible in his testimony, but most significantly, he could not opine that Commissioner Barth in fact did not sign the application. Moreover, the Court finds from common experience that pen lifts can easily occur in a genuine signature. In addition, the fact that the signature on Commissioner's Barth's recent affidavit is unique among the signatures in evidence suggests that the Commissioner does not sign his name in a consistent fashion, which could explain differences between the signatures on the warrant and the application.

The Court also notes that the totality of the circumstances does not suggest a forgery here. In particular, the fact that the signatures for Commissioner Barth on the warrant and the application are different does not further defendants' argument, but rather appears to undermine it. For instance, if both signatures were forged and the forger was attempting to copy a known signature by the Commissioner, the signatures would likely be more similar. On the other hand, if the Commissioner signed the warrant but forgot to sign the application, there is no reason why Sergeant Martin would not simply have pointed out that mistake and had the Commissioner sign the application as well. Defendants have not provided a logical and likely explanation for the two

11

signatures other than their being genuine. Accordingly, even if one or two forged signatures could provide a basis for invalidation of the warrant, defendants have not met their burden to prove any forgeries in this case.

The Court also concludes that, even if Commissioner Barth did not sign the warrant or application and the warrant should be deemed invalid, suppression would still not be appropriate because of the good-faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984) (because purpose of rule would not be furthered by suppression, exclusionary rule does not apply if officers in good faith and reasonably relied on a facially valid search warrant). Defendants have not cited any caselaw to support their argument that the good-faith exception to the exclusionary rule should not apply here, and the Court concludes that because the purpose of the rule would not be furthered by its application, the good-faith exception should apply in these circumstances. *See United States v. Callwood*, 66 F.3d 1110, 1113 (10th Cir. 1995) (good-faith exception to the exclusionary rule applies where officer was not given an oath when requesting a search warrant).

Applying the exception in this case, even if the Court were to believe, based on Mr. Lock's testimony, that the signatures for Commissioner Barth are not genuine (the Court does not so believe), it would find that there is not sufficient evidence that Sergeant Martin (instead of some clerk acting on Commissioner Barth's behalf) was responsible for the forgeries, or that Sergeant Martin should have recognized that the signatures were not genuine (despite the presence of the Commissioner's file-stamp).

12

Thus, there is no basis to find that Sergeant Martin did not rely on the warrant reasonably and in good faith.

For all these reasons, the Court denies defendants' motions to suppress evidence obtained from the search of the Avondale residence.[1]

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motions to suppress evidence obtained as a result of searches of a house and vehicle in Arizona on May 2, 2007 (Doc. ## 333, 338, 341, 357, 479) are **denied**.

IT IS SO ORDERED.

Dated this 14th day of January, 2011, in Kansas City, Kansas.

>s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

---

[1] Defendant Theodore McDowell argued in his motion that the police failed to file an inventory and return on the search warrant. After the Government provided a file-stamped copy of the return, Mr. McDowell withdrew that argument in his reply brief.