IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-20133-JWL |
| ) | |
| GLADSTONE MCDOWELL, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____) | |

## **MEMORANDUM AND ORDER**

The matter is presently before the Court on motions by defendants Gladstone McDowell (Doc. # 351) and Curtis Pitter (a/k/a Michael Francois) (Doc. # 361) to suppress evidence obtained from certain wiretaps. Defendants Samora McIntosh (in Doc. # 363) and Radell Bradford (in Doc. #477) have also joined in these motions to suppress. The Court heard argument on these motions at a hearing on October 19, 2010. On January 4, 2011, the Court issued a Memorandum and Order (Doc. # 602) in which it concluded that defendants were not entitled to a hearing under *Franks v. Delaware*, and it denied the motions to suppress to the extent that they relate to alleged misrepresentations or omissions in the wiretap applications. On January 31, 2011, the Court conducted another hearing on the motions to suppress the wiretaps, at which it heard argument on the issue of necessity and took evidence and heard argument on the issue of minimization. Based on the argument and evidence submitted at that hearing

and in the parties' briefs, the Court now **denies** the motions to suppress in their entirety.

### I.     Necessity

Defendants first seek to suppress the wiretap evidence on the ground that the wiretap applications did not satisfy the "necessity" requirement. The Tenth Circuit has described this requirement as follows:

> [T]he government must submit a written application to the issuing magistrate laying out, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c). This provision is called the "necessity requirement." The purpose of this requirement is to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. "Traditional investigative techniques" include surveillance, infiltration or undercover work, questioning of parcipants, execution of search warrants, and the use of pen registers and trap-and-trace devices. Section 2518 does not, however, mandate exhaustion of all possibilities; the requirement is met if the government demonstrates either that normal investigatory techniques have been tried and failed or that they reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try. The necessity requirement is not to be treated hypertechnically. We expect the government to act in a common sense fashion, and on review we will take in all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap.

*United States v. Verdin-Garcia*, 516 F.3d 884, 889-90 (10th Cir. 2008) (case citations and internal quotations omitted). "Once a wiretap has been authorized by a judge, it is presumed proper and the burden is on the defendant to prove its invalidity." *Id.* at 890.[1]

---

[1]The parties have agreed that the Court should consider only the wiretap applications themselves in deciding the necessity issue. *See, e.g.*, *United States v. Oregon-Cortez*, 244 F. Supp. 2d 1167, 1172 & n.5 (D. Colo. 2003) (determining proper
(continued...)

In their brief, defendants generally argue that the application affidavits did not demonstrate necessity because the use of traditional techniques did yield information (for instance, drugs and cash were seized in traffic stops and interdictions) and because the Government could have continued to use such techniques without resort to wiretaps.[2] The Court concludes, however, as set forth more fully below, that the affidavits—which were lengthy and which comprehensively detailed the investigation—were sufficient to show that the wiretaps were necessary to uncover information concerning the entire scope of the target drug-trafficking organization ("DTO"). Thus, the Court concludes that defendants have not met their burden to show that the wiretaps are invalid.

With respect to the traditional investigative techniques, defendants first note that the Government had used e-mail warrants, pen registers and trap-and-trace devices, which gave agents information about communications and geographic locations of the targets. The affidavits noted, however, that the members of the DTO were technologically savvy; that telephones may be registered in fictitious or alias names, or without subscriber information; and that agents had used pen registers and internet search warrants, as well as other traditional techniques, but that such techniques had failed to allow them to develop fully and identify the scope of the DTO. Defendants

---

[1](...continued)
scope of review under Tenth Circuit law).

[2]Defendants did not offer any additional arguments concerning necessity at the Court's hearings on the motions to suppress.

have not explained how the continued use of pen registers and the like could have yielded information concerning the DTO's scope, membership, sources, suppliers, customers, and so on, such that the wiretaps were rendered unnecessary.

Second, defendants take issue with the affiants' conclusion that there was no confidential source who could have been used to infiltrate the DTO or to provide enough information to dismantle the DTO. In particular, defendants suggest that agents could have made further use of a confidential source identified in the affidavits as CS1. The Court rejects this argument, for the reasons stated in its prior order relating to the wiretap suppression motions. As the Court previously noted, the information in the affidavits did not indicate that CS1 could be sufficiently connected to a source, as defendants suggest; rather, CS1 told authorities that a member of the DTO had stated that he could set up an account for CS1 with a source so that CS1 could get direct shipments of marijuana in the mail. That information did not suggest that CS1 would have had access to that source. Furthermore, the affidavits explained specifically why it would have been difficult to find a confidential source to infiltrate this DTO that included many members of the same families, as such members "are notoriously tight lipped about the information they would be willing to provide."

Third, defendants argue that undercover agents could be introduced into the DTO by CS1. The Court rejects this argument for the same reasons stated above with respect to the use of confidential sources. Again, the affidavits adequately explained why an undercover agent, without a pre-existing contact in the DTO, could not infiltrate such a

4

large, tight-knit DTO that would likely "only deal with and provide information to people known to them or people vouched for by close associates." Defendants have not suggested any feasible way that the Government could have infiltrated the DTO by using an undercover agent.

Fourth, defendants complain that additional surveillance could have been conducted, but the Court rejects this argument as well. The affidavits described in detail a number of examples of the surveillance that was conducted. The affidavits also explained specifically why surveillance alone could not provide the necessary information about the target organization. For instance, the affidavits noted that the members had become "evasive and unusually cautious in their movements" and described specific counter-surveillance methods employed by the DTO. The affidavits further stated that although surveillance could provide some information about certain members, it could not provide desired information concerning the scope of the DTO, its sources of supply, or its hierarchy. These statements were sufficient to show that the wiretaps were necessary to supplement the Government's surveillance efforts.

Fifth, defendants argue that the Government could have conducted more trash pulls. As the Government notes, however, the Tenth Circuit has not recognized the use of trash pulls as a traditional investigative technique that must be considered before wiretaps become necessary. *See, e.g.*, *Verdin-Garcia*, 516 F.3d at 890 (listing traditional techniques). Moreover, the affidavits described the limited attempts to conduct trash searches and explained why those searches "did nothing to further the investigation of

the bigger picture" of the DTO. The affidavits further noted that one target had been observed burning his trash; that no trash was left for pickup at one location; and that the target had set up cameras at that location, which would have alerted the target to the investigation if a trash pull had been attempted. Thus, the affidavits stated that additional trash pulls not only would be ineffective, but also could jeopardize the investigation, in light of the counter-surveillance techniques employed by the DTO. Accordingly, the Court rejects this prong of defendants' necessity argument.

Finally, the Court rejects defendants' challenge to the applications for the wiretaps after the first application. Defendants generally argue that the subsequent applications did not provide a lot of additional information not found in the initial application. It is true that a subsequent application must stand on its own with respect to the necessity requirement, in the sense that it is not sufficient merely for the issuing judge also to have previously read the initial application. *See United States v. Mondragon*, 52 F.3d 291, 293-94 (10th Cir. 1995). In this case, however, the subsequent applications were also comprehensive and did address why the use of traditional techniques had not provided or could not provide the information sought, and why the additional wiretaps were therefore necessary. The Court does not agree with defendants that seeking additional wiretaps means that previous wiretaps were not working, such that additional wiretaps would not aid the investigation—if that argument were accepted, then no subsequent applications could ever be approved. Moreover, in this case, as noted in some of the subsequent applications, the targets had acquired new telephone

numbers, and thus subsequent wiretaps were sought to continue monitoring calls by those targets. As stated by the Tenth Circuit in *Verdin-Garcia*, in which targets "dumped" phones and used multiple phones: "Where the government has once demonstrated sufficient necessity to wiretap, a target cannot defeat this showing of necessity simply by changing phone numbers." *See Verdin-Garcia*, 516 F.3d at 892 (internal quotations omitted) (quoting *United States v. Castillo-Garcia*, 117 F.3d 1179, 1196 (10th Cir. 1997), *overruled on other grounds by United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002)). Defendants have not shown that necessity was lacking with respect to any of the subsequent wiretaps.

For these reasons, the Court concludes that defendants have not met their burden, in overcoming the presumption of a wiretap order's validity, to show that the wiretaps did not comply with the necessity requirement. Therefore, the Court denies defendants' motions to suppress on that basis.

## II.     Minimization

Defendants also seek to suppress evidence obtained from the wiretaps on the basis of a lack of minimization by the Government while conducting the wiretaps. Under the governing statute, every order must provide that the wiretap "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). "A defendant may move to suppress evidence obtained from the wiretap if the wiretap was not undertaken in conformity with § 2518(5)'s minimization requirement." *United States v. Yarbrough*, 527 F.3d 1092, 1097

7

(10th Cir. 2008) (citing 18 U.S.C. § 2518(10)(a)).  The Supreme Court has commented on the minimization requirement as follows:

> The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations. Whether the agents have in fact conducted the wiretap in such manner will depend on the facts and circumstances of each case.

*Scott v. United States*, 436 U.S. 128, 140 (1978) (quoted in *Yarbrough*, 527 F.3d at 1097-98).

In *Yarbrough*, the Tenth Circuit reaffirmed its approved procedure "for determining the reasonableness of governmental efforts to avoid monitoring non-pertinent calls."  *See Yarbrough*, 527 F.3d at 1098.

> The government must make an initial prima facie showing of reasonable minimization.  Once the government has made a prima facie showing of reasonable minimization, the burden then shifts to the defendant to show more effective minimization could have taken place.

*Id.* (quoting *United States v. Willis*, 890 F.2d 1099, 1102 (10th Cir. 1989)).  The *Yarbrough* court also set forth the factors to be considered by the court:

> In determining whether the government has made a prima facie showing of reasonable efforts to minimize the interception of non-pertinent calls, we consider the factors identified by the Supreme Court in *Scott*:  (1) whether a large number of the calls are very short, one-time only, or in guarded or coded language; (2) the breadth of the investigation underlying the need for the wiretap; (3) whether the phone is public or private; and (4) whether the non-minimized calls occurred early in the surveillance.  It is also appropriate to consider (5) the extent to which the authorizing judge supervised the ongoing wiretap.

*Id.* (citing, inter alia, *Scott*, 436 U.S. at 140-41).  Finally, the court reaffirmed that,

8

"consistent with Supreme Court and Tenth Circuit precedent, in analyzing the reasonableness of the government's minimization efforts, [the cout] exclude[s] calls under two minutes." *Id.*

The Court concludes that the Government has made the required prima facie showing that it made reasonable efforts to minimize the interception of non-pertinent calls. At the evidentiary hearing, a case agent credibly testified that substantial minimization procedures were in place and followed during the wiretaps. For instance, case agents did not listen in on intercepted calls; rather, calls were monitored by persons fluent in English and a Jamaican patois, in which many of the conversations were conducted. The governing minimization procedures, which were approved by the ordering court, were read to the monitors, who were required to review the orders and the affidavits submitted to the court and to sign forms stating that they had done so. Those procedures were in fact followed in this case.[3]

In addition, the monitors were instructed to minimize privileged calls, and such calls were in fact minimized in this case, including calls involving one defendant's future wife and a call with a rabbi. In one instance, after an attorney was mentioned on a call,

---

[3] In their brief, defendants argue that monitors and supervising attorneys did not sign particular copies of the procedural memoranda. The agent testified, however, that the monitors did in fact acknowledge reading each memorandum, with one exception relating to a particular extension; in that instance, however, the monitors did acknowledge other similar memoranda the same day relating to other target telephones in the same investigation. That single oversight does not suggest that the Government did not make reasonable efforts to minimize the interception of non-pertinent calls.

9

that attorney's telephone was identified as a privileged number, even though no subsequent calls were made to that number. Moreover, monitors were instructed to minimize a call once they could determine that the call was not pertinent to the investigation, making additional spot checks of the call only every 60 seconds or so, and in fact a high percentage of non-pertinent calls over two minutes were minimized.[4]

The other factors cited by the Tenth Circuit also support a conclusion that the Government satisfied its burden to make a prima facie showing of reasonable minimization here. In particular, the investigation was quite broad in this case, the targets used a foreign language and codes, the targeted telephones were private, and the ordering court supervised the wiretap, with reports to the judge required every 15 days.

At the hearing, defendants' sole argument on the issue of minimization was that mistaken references in the memoranda to the Spanish language and supervision by federal ICE agents demonstrated a general sloppiness by the Government with respect to minimization procedures. The Court does not believe that the presence of such clerical errors is material, however; the errors did not affect the monitoring process (it

---

[4] For instance, in two-week period for one target telephone, 150 non-pertinent calls exceeded two minutes and a total of 118 calls were minimized. The agent testified that some of the minimized calls may have been calls lasting less than two minutes; thus, he could not provide the exact percentage of calls over two minutes that were minimized. Nonetheless, the Court is persuaded that the agents did make reasonable efforts to minimize non-pertinent calls and that a significant number of non-pertinent calls over two minutes were in fact minimized. *See, e.g.*, *Yarbrough*, 527 F.3d at 1098 (minimization of 25.6% of non-pertinent calls over two minutes was sufficient to support the conclusion that the Government made out a prima facie case of reasonable minimization).

10

was clear that the only foreign language at issue was the Jamaican patois), and it is evident that the Government did follow reasonable procedures to minimize non-pertinent calls. Defendants also noted in their brief that, at least with respect to one target telephone, the percentage of minimized non-pertinent calls did not trend upwards as the investigation progressed; the lack of such a trend is meaningless, however, in the face of a high percentage maintained from the very beginning, which suggests sufficient efforts to minimize. Finally, defendants noted in their brief that some privileged calls were intercepted, but the Court is persuaded that the Government did make reasonable efforts to minimize such calls.

For these reasons, the Court concludes that the Government has made the required prima facie showing of reasonableness, thereby shifting the burden to defendants to show that more effective minimization could have taken place. Defendants have not satisfied that burden. Defendants have not challenged any particular non-pertinent calls. Nor have defendants identified any particular way that the Government could have improved its minimization of non-pertinent calls. *See Willis*, 890 F.2d at 1102 (in upholding denial of suppression motion, court noted that the defendant had failed to point to any specific way in which more effective minimization could have taken place). As discussed above, the Government's minimization efforts were reasonable in this case. Accordingly, the Court denies defendants' motions to suppress the wiretap evidence for want of minimization.

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motions to suppress wiretap evidence (Doc. ## 351, 361) are **denied**.

IT IS SO ORDERED.

Dated this 2nd day of March, 2011, in Kansas City, Kansas.

                                                    s/ John W. Lungstrum
                                                    John W. Lungstrum
                                                    United States District Judge